Adam R. Schwartz, Esq. – Attorney ID No. 040591992
James J. Tarnofsky, Esq. – Attorney ID No. 031581997
**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
Morristown, New Jersey 07962-2075
(973) 993-8100 (T)
(973) 425-0161 (F)
*Attorneys for Plaintiff,*
*Selective Insurance Company*
*of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SELECTIVE INSURANCE COMPANY OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>THE MINORITY ALLIANCE GROUP, LLC, ENERGY SITE SERVICES, LLC, SHAWN ADLER, KAITLYN ADLER, CHAD MYERS, ANGELA MYERS, TIMOTHY CONNORS, SUZANNE CONNORS, JAMES F. GOVAN, and DOROTHY B. GOVAN,<br><br>     Defendants. | Civil Action No.:<br><br>**VERIFIED COMPLAINT** |

PLAINTIFF, Selective Insurance Company of America, by and through its attorneys, McElroy, Deutsch, Mulvaney & Carpenter, LLP, as and for its complaint against Defendants, The Minority Alliance Group, LLC, Energy Site Services, LLC, Shawn Adler, Kaitlyn Adler, Chad Myers, Angela Myers, Timothy Connors, Suzanne Connors, James F. Govan, and Dorothy B. Govan, says:

## JURISDICTION

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1332(a) in that this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the venue provision recited in the contract between the parties specifies that all actions shall be commenced in this District.

## PARTIES

3. At all relevant times hereinafter mentioned, Selective Insurance Company of America ("SICA") was and is a corporation organized and existing under the laws of the State of New Jersey, with a principal place of business at 40 Wantage Avenue, Branchville, New Jersey.

4. Defendant The Minority Alliance Group, LLC ("MAG") is a corporation organized and existing under the laws of the State of Michigan with a principal place of business at 508 E Grand River Ave, Suite 300A, Brighton, MI 48116.

5. Upon information and belief, the sole member of MAG is Kaitlyn Adler, who resides in Fenton County, Michigan.

6. Upon information and belief, no members of MAG reside in the state of New Jersey.

7. Defendant Energy Site Services, LLC, ("ESS") is a corporation organized and existing under the laws of the State of Michigan with a principal place of business at 508 E Grand River Ave, Suite 300A, Brighton, MI 48116.

8. Upon information and belief, the sole member of ESS is Kaitlyn Adler, who resides in Fenton County, Michigan.

9. Upon information and belief, no members of ESS reside in the state of New Jersey.

10. Defendant Shawn Adler is an individual residing at 1125 Jordan Lane, Grand Blanc, MI 48439.

11. Defendant Kaitlyn Adler is an individual residing at 1125 Jordan Lane, Grand Blanc, MI 48439.

12. Defendant Chad Myers is an individual residing at 4763 Aljoann Road, Brighton, MI 48116-4717.

13. Defendant Angela Myers is an individual residing at 4763 Aljoann Road, Brighton, MI 48116-4717.

14. Defendant Timothy Connors is an individual residing at 1 Long Meadow Drive, Westwood, MA 02090.

15. Defendant Suzanne Connors is an individual residing at 1 Long Meadow Drive, Westwood, MA 02090.

16. Defendant James F. Govan is an individual residing at 50241 Drakes Bay Drive, Novi, MI 48374.

17. Defendant Dorothy B. Govan is an individual residing at 50241 Drakes Bay Drive, Novi, MI 48374.

**GENERAL ALLEGATIONS**

18. At all times relevant hereto, Energy Drilling Services, LLC ("EDS), a corporation organized and existing under the laws of the State of Michigan that has since filed for bankruptcy in the Eastern District of Michigan, was engaged in the construction contracting business in connection with, among other things, acting as a subcontractor or contractor on construction

projects. EDS is not a named defendant in the present action due to the automatic stay imposed as a result of the bankruptcy filing.

19. In connection with its business, EDS was required to provide surety bonds assuring the performance of its construction project work, and payment of its subcontractors.

20. On or about November 3, 2021, in consideration for and in order to induce SICA, as surety, to issue bonds on behalf of EDS, as principal, EDS and Defendants MAG, ESS, Shawn Adler, Kaitlyn Adler, Chad Myers, Angela Myers, Timothy Connors, Suzanne Connors, James F Govan, and Dorothy B Govan (the Defendants hereinafter referred to collectively as the "Indemnitors") executed an agreement entitled General Agreement of Indemnity ("Indemnity Agreement") in favor of Plaintiff SICA.

21. A true and correct redacted copy of the Indemnity Agreement is attached hereto as **Exhibit A.**

22. Pursuant to Paragraph 3 of the Indemnity Agreement, the Indemnitors agreed, among other things, to be jointly and severally liable to SICA (defined as "Surety" in the Indemnity Agreement) and to:

> INDEMNITY; PAYMENTS; LOANS; EVIDENCE. The Indemnitors hereby jointly and severally covenant, promise and agree to exonerate, indemnify and save harmless Surety (and any surety that Surety procures to execute any Bond and any other surety which Surety may act as co-surety on any Bond or other instrument) from and against any and all liability, loss, cost, damage and expense of whatsoever kind or nature, including, but not limited to, interest, court costs and counsel, attorneys, consulting, accounting and other professional and trade fees, whether incurred on a flat fee per claim, percentage, time and material, hourly or other basis, (including the cost of in-house professionals) which Surety may sustain, incur, be put to or to which it may be exposed (1) by reason of having executed any Bond or other instrument or any renewal, modification, continuation, substitution or extension thereof, (2) by reason of the failure of any one or more of the Indemnitors to perform or comply with the promises, covenants and conditions of this Agreement or, (3) in enforcing any of the promises, covenants or conditions of this Agreement. The liability of the Indemnitors shall extend to and include the amount of all payments, together with interest thereon at the rate of prime as published by

the Wall Street Journal(or similar national financial publication should the Wall Street Journal cease to publish such rates) plus two points from the date of such payments, made by Surety under Surety's belief that (1) Surety was or might be liable therefore or (2) the payments were necessary or advisable to protect any of Surety's rights or to avoid or lessen Surety's liability or alleged liability. While the Surety shall be under no obligation to advance or loan money to any Indemnitor, the liability of the Indemnitors shall also extend to any loans or advances, including any interest thereon, made by or guaranteed by Surety for the benefit of one or more of the Indemnitors, without any obligation on Surety's part to see the application thereof. Payment by reason of the aforesaid causes shall be made by the Indemnitors to the Surety at its Home Office in Branchville, New Jersey as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore. Indemnitors agree that the vouchers or other evidence of such payments sworn to buy a duly authorized representative of Surety shall be prima facie evidence of the fact and extent of the liability of the Indemnitors to Surety.

23. Pursuant to Paragraph 4 of the Indemnity Agreement, the Indemnitors further agreed, among other things, that:

> DEMANDS FOR COLLATERAL. If Surety or any reinsurer shall establish a reserve to cover any liability, claim asserted, suit, award or judgment in connection with any Bond, or any loss, cost, expense or fee in connection therewith, the Indemnitor's, immediately upon demand (the "Collateral Demand"), whether or not Surety shall have made any payment therefore and whether or not the collateral demanded may be in addition to other collateral security previously provided to Surety shall provide to Surety at its Home Office, funds and/or other collateral security, which Surety in its sole discretion deems adequate, equal in value to such reserve and any increase thereof as collateral security on such Bond. Such funds and any other property previously provided to Surety shall be held subject to the terms of this Agreement. If the Indemnitors fail to provide Surety with sufficient collateral after a Collateral Demand, they shall be in default of this Agreement. Indemnitors agree that their failure to provide collateral as demanded by Surety shall constitute irreparable harm to Surety for which it has no adequate remedy at law and that Surety may obtain injunctive relief compelling the delivery to Surety of sufficient collateral or in the alternative, Surety may obtain a judgment against each or any of the Indemnitors for the amount of the Collateral Demand plus the costs of obtaining the judgment, including its attorneys fees by any legal or equitable process. Any Collateral Demand reduced to a judgment may be immediately executed upon and any asset of an Indemnitor levied upon may either be held as collateral or liquidated in any manner deemed appropriate by Surety, including private or judicial sale. The proceeds of such liquidated assets may be held by Surety as collateral and applied to any of the Indemnitors' obligations to Surety arising under this agreement or otherwise.

24. Additionally, pursuant to Paragraph 12 of the Indemnity Agreement, the Indemnitors further agreed:

> BOOKS, RECORDS & CREDIT REPORTS. Indemnitors warrant and represent that any financial information furnished by any Indemnitor to Surety is true and accurate and acknowledge that Surety has and will continue to rely upon such information in executing any Bond. Indemnitors shall have a continuing obligation to provide current financial information to Surety until such time as all obligations of the Indemnitors hereunder have been discharged. Surety, at any time, shall have continuous and uninterrupted access to the books, records, accounts and nonconsumer and consumer credit reports of the Indemnitors and to all matters and information concerning any Bond(s) or instrument(s) executed by Surety and the financial condition, credit worthiness and assets of any Indemnitor until the liability of Surety under each and every Bond or other instrument executed by it and each and every obligation of the Indemnitors under this Agreement is terminated and discharged to the satisfaction of Surety. Bank, depositories, consumer credit reporting agencies, materialmen, supply houses, obligees on the Bonds and all other persons or organizations are hereby authorized to furnish Surety, at its request, any information (including copies thereof) requested including, but not limited to, consumer credit reports of any individual Indemnitor, the status of work under contracts being performed by an Indemnitor, the condition of the performance of such contracts and payments of such accounts. Regarding consumer credit reports, each Indemnitor agrees that a photocopy of this agreement shall constitute a written request of the Indemnitor which the Surety may presented to a Consumer Credit Reporting Agency as proof of Surety's authority to obtain a Consumer Report as defined under the Fair Credit Reporting Act.

25. On or about January 14, 2022, EDS entered into subcontract with BAI Group, LLC ("BAI") to furnish labor, materials, equipment and services as subcontractor to BAI in connection with a subcontract commonly referred to as Work Order No. 4 - Electrical Construction Viaduct Solar Farm Gen-Tie-Viaduct Power Facility Project (the "Work Order No. 4 Subcontract").

26. On or about January 14, 2022, SICA, as surety, issued a subcontract performance bond, bond number B1256809, and a subcontract payment bond, also bearing bond number B1256809, and each in the penal sum of $343,785.00 (together, the "BAI Work Order No. 4 Bonds"), and each on behalf of EDS as principal, and in favor of BAI as Obligee. A true and correct copy of BAI Work Order No. 4 Bonds are attached hereto as **Exhibit "B."**

27. On or about January 14, 2022, EDS entered into subcontract with BAI to furnish labor, materials, equipment and services as subcontractor to BAI in connection with a contract commonly referred to as Work Order No. 3 – Civil Construction Viaduct Solar Farm Gen-Tie-Viaduct Power Facility Project (the "Work Order No. 3 Subcontract").

28. On or about January 14, 2022, SICA, as surety, issued a subcontract performance bond, bond number B1256810, and a subcontract payment bond, also bearing bond number B1256810, and each in the penal sum of $420,689.00 (together, the "BAI Work Order No. 3 Bonds"), and each on behalf of EDS as principal, and in favor of BAI as Obligee. A true and correct copy of BAI Work Order No. 3 Bonds are attached hereto as **Exhibit "C."**

29. On or about October 25, 2021, EDS entered into contract with Linxon US, LLC, ("Linxon") to furnish labor, materials, equipment and services as contractor to Linxon in connection with a contract commonly referred to as the Susquehanna Data Civil Works Project (the "Linxon Contract").

30. On or about October 25, 2021, SICA, as surety, issued a contract performance bond, bond number B1253353, and a contract payment bond, also bearing bond number B1253353, and each in the penal sum of $700,000 (together, the "Linxon Bonds"), and each on behalf of EDS as principal, and in favor of Linxon as Obligee. A true and correct copy of Bond Linxon Bonds are attached hereto as **Exhibit "D."**

31. On or about September 13, 2021, EDS entered into contract with BAI to furnish labor, materials, equipment and services as contractor to BAI in connection with a contract commonly referred to as the Viaduct 24 MWDC PV System, 1676 Viaduct Road, Rockton, PA Project (the "BAI PA Contract").

32. On or about September 13, 2021, SICA, as surety, issued a contract performance bond, bond number B1253486, and a contract payment bond, also bearing bond number B1253486, and each in the penal sum of $291,282.00 (together, the "BAI PA Bonds"), and each on behalf of EDS as principal, and in favor of BAI as Obligee. A true and correct copy of BAI PA Bonds is attached hereto as **Exhibit "E."**

33. SICA has received two claims against the Linxon Bonds. One claim by Riverview Block for $113,968.10 and one by McPhee Electric for $313,769.01.

34. In addition, SICA has also received a claim under the BAI PA Bonds from J.M. DeLullo Stone Sales, as subcontractor, for $38,379.21.

35. The total amount of claims received to date by SICA under all EDS Bonds is $466,116.32 (hereinafter the "Bond Claims").

36. In addition, Linxon has advised SICA that numerous subcontractors and suppliers of EDS, in connection with the Linxon Contract, have notified Linxon that they are owed in excess of the $700,000.00 penal sum of the Linxon Bonds

37. In light of EDS's bankruptcy filing, SICA has a reasonable belief that it will receive additional claims against the Linxon and BAI PA Bonds, as well as the other two bonds provided to EDS and the Indemnitors.

38. Due to EDS filing for bankruptcy, it appears that EDS has insufficient assets to fully resolve the claims of the present and future bond claimants and is unable to provide collateral and indemnify SICA as required under the terms of the Indemnity Agreement.

39. Since EDS filed for bankruptcy, the present action against the remaining Indemnitors takes on that much more importance in providing sufficient collateral to SICA as set forth in the Indemnity Agreement.

40. In response to the Bond Claims, SICA established a loss reserve in amount of $738,379.21.

41. By letter dated December 30, 2022, and consistent with the provisions of the Indemnity Agreement SICA made a Collateral Demand on the Indemnitors, jointly and severally, for collateral in the amount of $738,379.21 to be posted no later than January 20, 2023. A true and correct copy of the Collateral Demand is attached hereto as **Exhibit "F."**

42. Despite due demand, the Indemnitors have refused, and continue to refuse, to honor their obligations to provide collateral as demanded in the Collateral Demand.

43. On or about February 9, 2023, SICA has received an additional payment bond claim in the amount $178,306.00 under the BAI PA Bonds by A.M. Logging, LLC, in connection work allegedly performed on the BAI PA Contract.

## FIRST COUNT

### CONTRACTUAL INDEMNIFICATION

44. SICA repeats and realleges each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

45. SICA, as surety, issued the Bonds on behalf of EDS, as principal.

46. SICA, as surety, remains exposed to liability by virtue of issuing the bonds and the claims asserted by the Bond Claims.

47. SICA, as surety, has incurred costs and expenses in connection with the bonds.

48. SICA expects to incur additional costs and expenses, and may incur a loss as a result of having issued the bonds, among other things.

49. The Indemnitors have failed and refused to honor their obligations under the Indemnity Agreement, and have otherwise breached the Indemnity Agreement.

50. As a direct result of the Indemnitors' breaches of the Indemnity Agreement, SICA has sustained damages, costs and expenses, and will continue to sustain damages, costs and expenses.

51. Based on the foregoing, the Indemnitors are jointly and severally liable to SICA for the damages, losses, costs, expenses and attorneys' fees SICA has sustained to date, and for any and all liability, losses, costs, expenses and attorneys' fees that may be incurred by SICA in the future.

**WHEREFORE**, SICA demands that judgment be entered against the Indemnitors, jointly and severally:

(a) for contractual indemnification, for all costs and expenses incurred to date, as well as any future losses, costs, and expenses, including but not limited to attorneys' fees incurred or to be incurred by SICA, together with appropriate interest thereon;

(b) for declaratory relief, declaring the Indemnitors jointly and severally liable to SICA for all loss, liability, cost or expense to which SICA may be exposed or which it may sustain; and

(c) awarding interest, costs of sit, attorneys' fees and such other and further relief as may be just and equitable.

## SECOND COUNT

### SPECIFIC PERFORMANCE OF THE INDEMNITY AGREEMENT TO ENFORCE SICA'S DEMAND TO DEPOSIT COLLATERAL

52. SICA repeats and realleges each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

53. Pursuant to Paragraph 4 of the Indemnity Agreement, the Indemnitors further agreed, among other things, that:

> DEMANDS FOR COLLATERAL. If Surety or any reinsurer shall establish a reserve to cover any liability, claim asserted, suit, award or judgment in connection with any Bond, or any loss, cost, expense or fee in connection therewith, the Indemnitor's, immediately upon demand (the "Collateral Demand"), whether or not Surety shall have made any payment therefore and whether or not the collateral demanded may be in addition to other collateral security previously provided to Surety shall provide to Surety at its Home Office, funds and/or other collateral security, which Surety in its sole discretion deems adequate, equal in value to such reserve and any increase thereof as collateral security on such Bond. Such funds and any other property previously provided to Surety shall be held subject to the terms of this Agreement. If the Indemnitors fail to provide Surety with sufficient collateral after a Collateral Demand, they shall be in default of this Agreement. Indemnitors agree that their failure to provide collateral as demanded by Surety shall constitute irreparable harm to Surety for which it has no adequate remedy at law and that Surety may obtain injunctive relief compelling the delivery to Surety of sufficient collateral or in the alternative, Surety may obtain a judgment against each or any of the Indemnitors for the amount of the Collateral Demand plus the costs of obtaining the judgment, including its attorneys' fees by any legal or equitable process. Any Collateral Demand reduced to a judgment may be immediately executed upon and any asset of an Indemnitor levied upon may either be held as collateral or liquidated in any manner deemed appropriate by Surety, including private or judicial sale. The proceeds of such liquidated assets may be held by Surety as collateral and applied to any of the Indemnitors' obligations to Surety arising under this agreement or otherwise.

54. By the Collateral Demand letter, SICA demanded collateral from the Indemnitors.

55. The Indemnitors have failed and refused to deposit collateral with SICA as security for the full performance of the Indemnity Agreement.

**WHEREFORE**, SICA demands judgment against the Indemnitors, jointly and severally, for specific performance as follows:

(a) ordering and directing the Indemnitors, and each of them, and their officers, agents, employees, attorneys and other persons acting on their behalf, immediately to deposit collateral with SICA in the amount of $738,379.21;

(b) restraining and enjoining the Indemnitors and their agents from transferring, encumbering or otherwise disposing of, and from concealing and secreting any of their property and assets, real, personal and mixed, whether jointly or solely owned, which might serve as collateral so as to secure SICA from liability herein until proof of record satisfactory to the Court is presented to establish that all claims to which SICA is exposed have been liquidated and discharged;

(c) requiring the Indemnitors to render to SICA a full and complete accounting of all assets owned by them or anyone of them in which they or any one of them may have an interest;

(d) requiring the Indemnitors to allow SICA full and complete access to all financial books, records, documents and accounts maintained by them or any one of them in which they may have an interest; and

(e) awarding interest, costs of suit, attorneys' fees and such other and further relief as may be just and equitable.

## THIRD COUNT

### SPECIFIC PERFORMANCE OF THE INDEMNITY
### AGREEMENT TO INSPECT BOOKS AND RECORDS

56. SICA repeats and realleges each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

57. Pursuant to Paragraph 12 of the Indemnity Agreement, the Indemnitors agreed:

BOOKS, RECORDS & CREDIT REPORTS. Indemnitors warrant and represent that any financial information furnished by any Indemnitor to Surety is true and accurate and acknowledge that Surety has and will continue to rely upon such information in executing any Bond. Indemnitors shall have a continuing obligation to provide current financial information to Surety until such time as all obligations of the Indemnitors hereunder have been discharged. Surety, at any time, shall have continuous and uninterrupted access to the books, records, accounts and nonconsumer and consumer credit reports of the Indemnitors and to all matters and information concerning any Bond(s) or instrument(s) executed by Surety and the financial condition, credit worthiness and assets of any Indemnitor until the liability of Surety under each and every Bond or other instrument executed by it and each and every obligation of the Indemnitors under this Agreement is terminated and discharged to the satisfaction of Surety. Bank, depositories, consumer credit reporting agencies, materialmen, supply houses, obligees on the Bonds and all other persons or organizations are hereby authorized to furnish Surety, at its request, any information (including copies thereof) requested including, but not limited to, consumer credit reports of any individual Indemnitor, the status of work under contracts being performed by an Indemnitor, the condition of the performance of such contracts and payments of such accounts. Regarding consumer credit reports, each Indemnitor agrees that a photocopy of this agreement shall constitute a written request of the Indemnitor which the Surety may presented to a Consumer Credit Reporting Agency as proof of Surety's authority to obtain a Consumer Report as defined under the Fair Credit Reporting Act.

58. The Indemnitors have failed to honor their obligations under the Indemnity Agreement, and have otherwise breached the Indemnity Agreement.

59. Without full, complete and immediate access to all of the Indemnitors' books, records and other documents, SICA may be unable to determine the most effective means of otherwise minimizing its potential losses and pursuing its rights.

60. Based on the foregoing, SICA has sustained damages, losses, costs and expenses, and will continue to sustain damages, losses, costs and expenses.

**WHEREFORE**, SICA demands judgment against the Indemnitors, jointly and severally, for specific performance as follows:

(a) specifically enforcing the Indemnity Agreement, by enjoining, ordering and directing the Indemnitors, and each of them, and their officers, agents, employees, attorneys and other persons acting on their behalf, immediately to provide to SICA full and complete access to all of the Indemnitors' books, records and other documents for inspection and copying;

(b) requiring the Indemnitors to render to SICA a full and complete accounting of all assets owned by them or anyone or any of them in which they or any one of them may have an interest; and

(c) awarding interest, costs of suit, attorneys' fees and such other and further relief as may be just and equitable.

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
*Attorneys for Plaintiff,*
*Selective Insurance Company of America*

Dated:  February 14, 2023          By:  */s/   Adam R. Schwartz*
                                         Adam R. Schwartz, Esq.

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

Pursuant to Local Civil Rule 11.2, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding. No other action or arbitration proceeding is contemplated and no other parties need to be joined in the above action.

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
*Attorneys for Plaintiff,*
*Selective Insurance Company of America*

Dated:  February 14, 2023            By: /s/ Adam R. Schwartz
                                          Adam R. Schwartz, Esq.

## VERIFICATION

STATE OF NEW JERSEY         )
                            ) SS:
COUNTY OF SUSSEX            )

I, Gerald N. Carozza, Jr., of full age, being duly sworn according law, upon his oath deposes and says:

1. I am a bond claim specialist, of Selective Insurance Company of America. I have personal knowledge of the facts set forth herein, and, if necessary, am competent to testify as to same.

2. I have read the foregoing Verified Complaint and exhibits, and state that the facts contained therein are of my own knowledge, except as to matters therein stated to be alleged on information and belief and, as to those matters, I believe them to be true based on information and belief from sources deemed to be reliable.

3. I verify under penalty of perjury that the foregoing is true and correct.

Executed on: February 14, 2023

_____
Gerald N. Carozza, Jr.